Henry W. Minor v. Commissioner. Henry W. Minor and May Belle H. Minor v. Commissioner.
Minor v. Commissioner
Docket Nos. 53544, 53545.
United States Tax Court
T.C. Memo 1956-175; 1956 Tax Ct. Memo LEXIS 117; 15 T.C.M. (CCH) 906; T.C.M. (RIA) 56175; July 27, 1956
John A. Darsey, Esq., Hurt Building, Atlanta, Ga., for the petitioners. Alben E. Carpens, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings the Commissioner determined deficiencies in income tax and imposed additions for fraud as follows: Henry W. Minor, Docket No. 53544
Income Tax
50% Addition
Year
Deficiency
for Fraud
1943
$ 4,671.52
$2,335.76
1944
1,120.49
1,301.74
1945
13,959.74
9,164.30
1946
15,356.50
7,678.25
1947
12,423.03
6,211.52
Henry W. Minor and May Belle H. Minor,
Docket No. 53545
1948
$ 1,234.70
$ 617.35
*118 The issues for decision are: (1) Did petitioner Henry W. Minor understate his income for the years 1943 to 1948, inclusive, and if so, in what amounts? (2) Are the petitioners liable for the 50 per cent for fraud imposed by the Commissioner? (3) Is the tax for the year 1943 barred by limitation, or is it collectible by reason of fraud as prescribed in section 276(a) of the Internal Revenue Code of 1939? Findings of Fact Petitioners Henry W. Minor and May Belle H. Minor are husband and wife, residing in Atlanta, Georgia. He filed his individual income tax returns for each of the years 1943 to 1947, inclusive, and they both filed a joint return for 1948, all of which returns were filed with the then collector of internal revenue for the District of Georgia. The term petitioner hereinafter used will refer to Henry W. Minor. All income in question was earned by him. May Belle H. Minor had no income of her own and is a party herein because of the joint return filed for the year 1948. Petitioner is a doctor and has, since 1912, continuously practiced medicine in Atlanta, Georgia, and his principal income during the taxable years was derived therefrom. He had a good practice *119 which increased during World War II. Among other income sources were rents, stocks and savings deposits. Petitioner personally handled all income received and all amounts paid out, making practically all banking deposits, and he alone signed checks and disbursed same. He always kept large sums of money on his person, some times as much as $4,000, which he used for cashing checks of patients, and often for his own personal expenditures, many of which were paid in cash. He gave his wife $150 to $200 in cash monthly for household expenses. Petitioner personally made and signed all of his income tax returns, with such help as was available at the local public assistance office of the Internal Revenue Service. Petitioner had no bookkeeper and kept no regular set of books. There was no ledger journal and his records for the taxable years consisted of record cards for each patient, certain expenditure sheets, little 2 1/2 by 5 inch notebooks with loose pages, cancelled check for the year 1946, 1947 and 1948 and certain check stubs. These were all of the single entry system. Petitioner personally made all entries on his records, except his nurse or receptionist would enter the name of *120 a patient on cards prepared for new patients. Petitioner's books and records as kept did not accurately reflect his income during the taxable years here involved, and it is impossible to determine therefrom his correct income. During 1943 to 1948, inclusive, and prior thereto, petitioner kept unknown amounts of money in a safe deposit box which he and his brother maintained, and kept large sums in his office safe. He had at all times in question a general banking account in which he made deposits and against which he drew checks, and also had savings accounts in three different banks. Some cash receipts were not deposited in a bank. The following shows petitioner's bank deposits for the years 1943 to 1948, inclusive, the gross receipts from all sources he reported on his tax returns for said years, and the excesses of his deposits over his reported gross receipts: Reported
Excess
Year
Bank Deposits
Gross Receipts
Bank Deposits
1943
$ 27,756.73
$ 21,603.88
$ 6,152.85
1944
41,079.94
26,992.03
14,087.91
1945
49,478.77
29,163.39
20,315.38
1946
74,500.85
31,025.57
43,475.28
1947
43,201.22
31,639.80
11,561.42
1948
46,181.10
30,523.45
15,657.65
Totals
$282,198.61
$170,948.12
$111,250.49
*121 On the last day of each of the years 1941 to 1948, inclusive, petitioner had a credit balance in his checking account in the First National Bank of Atlanta as follows: December 31
Balances in
of year
Checking Account
1941
$ 4,147.09
1942
4,139.18
1943
6,799.65
1944
$10,843.91
1945
35,325.68
1946
40,755.27
1947
33,397.57
1948
15,116.43
Petitioner's balances in his three savings accounts at the end of each of the years 1943 to 1948, inclusive, were as follows: Balances in Banks
December 31
First National
Citizens & Southern
Georgia Savings
of year
Bank
National Bank
Bank & Trust Co.
1943
$1,111.33
$1,047.12
$1,238.06
1944
1,122.46
1,057.61
1,266.06
1945
1,133.71
1,068.20
1,291.50
1946
3,145.06
3,085.58
3,330.78
1947
3,173.23
3,116.52
3,397.72
1948
3,205.05
3,147.77
3,466.00
At the end of each of the years 1941 to 1948, inclusive, petitioner owned Government bonds at cost value, purchased with his own money, as follows: On December 31
Government
of year
Bonds
1941
$21,037.50
1942
24,262.50
1943
27,825.00
1944
31,575.00
1945
35,325.00
1946
41,325.00
1947
58,200.00
1948
71,437.50
*122 At the end of each of the years 1941 to to 1948, inclusive, petitioner owned corporate stocks purchased by him with his own funds as follows: On December 31
Corporate
of year
Stocks
1941
$4,870.00
1942
4,870.00
1943
$4,870.00
1944
4,870.00
1945
1,370.00
1946
1,370.00
1947
1,370.00
1948
745.00
At the end of the years 1941 to 1948, inclusive, near relatives or members of petitioner's family owed him the following amounts because of loans made by him to them: On December 31
Amount of
of year
Money Owed
1941
$1,500.00
1942
1,500.00
1943
1,500.00
1944
1,500.00
1945
1,500.00
1946
1,500.00
1947
6,300.00
1948
5,750.00
During the years 1943 to 1948, inclusive, petitioner made non-deductible expenditures for the purposes and in the amounts listed in the table below: His Son's Education
Payment of
and Establishment
Petitioner's
Petitioner's
Year
in Dental Practice
Income Taxes
Insurance Premiums
1943
$2,497.87
$2,200.00
$3,222.88
1944
2,497.87
3,235.78
1,222.88
1945
2,497.87
2,889.91
5,422.88
1946
5,000.00
3,977.10
2,510.44
1947
8,906.38
5,324.45
2,423.13
1948
600.00
9,175.04
5,433.01
*123 Exhibit A is respondent's detailed net worth statement on which his deficiency notice is based, and Exhibit 25 is petitioner's net worth statement compiled by an accountant employed by petitioner after investigation herein was begun. Without approving the correctness of either, but for the purpose of comparison and revealing the wide variance therein, both of these exhibits in their entirety are by this reference made a part hereof. From these exhibits figures (cents omitted) in the following table are taken: 12/31/43
12/31/44
12/31/45
12/31/46
12/31/47
12/31/48
Total Assets, Ex. "A"
$105,048
$101,462
$113,311
$133,640
$148,762
$147,062
Total Assets, Ex. "25"
141,814
140,473
132,973
138,952
126,028
110,933
Increase (or decrease) in Net Worth,
Ex. "A"
$ 5,295
($ 565)
$ 15,912
$ 21,623
$ 14,489
($ 1,907)
Increase (or decrease) in Net Worth,
Ex. "25"
$ 7,178
$ 1,679
($ 3,436)
$ 7,273
($ 13,556)
($ 15,302)
Net Income as Corrected (Subject to
Income Tax) Ex. "A"
$ 20,216
$ 16,266
$ 41,142
$ 43,361
$ 38,043
$ 20,300
Net Income as Corrected (Subject to
Tax) Ex. "25"
$ 17,849
$ 10,199
$ 20,710
$ 22,663
$ 5,962
$ 3,218
Net Income as Corrected (Subject to
Victory Tax) Ex. "A"
$ 20,951
Net Income as Corrected (Subject to
Victory Tax) Ex. "25"
$ 18,584
*124 During the taxable years, as stated below, aside from owning his home, petitioner owned real estate, all purchased by him, most of which was improved and from which he received rents, viz.: Real Estate
Date Acquired
Cost
Date Sold
922 Highland View
5/28/24
$ 5,180.00
12/18/44 [1]
793 Cascade Ave.
10/ 1/28
$ 5,126.54
795 Cascade Ave.
5/21/24
$ 3,557.00
1/2 Interest in 964 Rupley Drive
5/ 1/37
$12,929.67
2/ 2/45 [2]
Prior to
1/2 Interest in Peachtree-Dunwoody Road
1941
$15,350.60
Prior to
Lot 22, E. Rivers Subdivision, Acorn Ave.
1941
$ 1,008.24
On August 14, 1950, five months after the Commissioner's agent's report was prepared, and seven months before the petitioner filed his original protest, the petitioner caused his three savings accounts to become joint accounts with his sister, Evelyn C. Minor. On September 1, 1950, the petitioner conveyed his 793 and 795 Cascade Avenue rental properties and also his one-half interest in the Peachtree-Dunwoody residence to his sisters, Mrs. Eva Mae McManmon and Miss Evelyn Minor, for a recited *125 $10 and other consideration. The properties were not subject to any mortgages at that time. During the years 1941 to 1948, inclusive, petitioner owned office furniture, X-ray and electrical equipment, and a library at the cost values of $3,500, $5,081.75 and $800, respectively. During the years 1941 to 1947, inclusive, petitioner owned crypts in the West View Cemetery of a cost value to him of $350, and in 1948 he purchased additional crypts at a total cost value of $5,320. During 1943 to 1945, inclusive, petitioner owned automobiles at a total cost value of $1,806.85. During 1946 petitioner sold a Chrysler automobile which he had owned since 1942, and failed to report same in his income tax return, from which he derived a total gain of $1,000. On or about October 1, 1946, petitioner purchased a Studebaker automobile at a cost of $1,800, which he sold in 1947 for a profit of $150, which he failed to report. On October 23, 1946, petitioner purchased a Cadillac automobile at a cost of $2,838, which he owned at the end of the years 1946 to 1948, inclusive. On or about September 30, 1947, petitioner purchased a Studebaker automobile at a cost of $1,934, which he owned at *126 the end of the years 1947 and 1948. The investigation of petitioner by Commissioner's agents started about April 1949. Shortly thereafter petitioner employed an attorney and gave him written power of attorney to act for him, and in June 1949, he paid this attorney $10,000 for his services. After the Commissioner's agents started the investigation, the petitioner had the firm of Hodges and Smith, certified public accountants, audit and take care of his records and prepare the petitioner's subsequent tax returns. Harold Smith of that firm had also previously taken care of the prior matter of petitioner's claimed loss from the sale of the 964 Rupley Drive property, improperly claimed on petitioner's 1945 tax return. No one of that accounting firm was called by petitioner to testify on his behalf. On his tax returns for the years 1946, 1947 and 1948, petitioner improperly claimed deductions for depreciation on his Cadillac automobile in the respective amounts of $177.06, $665, and $498.98. On his 1945 tax return, petitioner failed to report income in the amount of $1,000, when he understated by that amount the sales price received from the sale of the 964 Rupley Drive property *127 during that year. On his 1945 tax return petitioner improperly reported a sale of his 922 Highland View property which had actually occurred in 1944, in order to get the benefit of a claimed capital loss on another parcel of real estate in 1945. Petitioner's family expenses in the taxable years, including cash given his wife but not including sums for his son's education, were $400 per month. The table below lists Government E bonds purchased with his funds by petitioner (designated therein "H.W.M.") in the taxable years, in which his sisters, Eva or Evelyn, were named as alternative owners: Total Accrual
Amount
Date
Number
Value Ten
Paid in
Purchased
Alternative Owners
of Bonds
Years Hence
Purchase
10/ 4/45
H.W.M. or Evelyn
3
$2,500
$1,875
10/ 4/45
H.W.M. or Eva
3
2,500
1,875
5/15/47
Eva or H.W.M.
5
5,000
3,750
5/15/47
E.A.M. or H.W.M.
5
5,000
3,750
8/ 9/48
Eva or H.W.M.
5
5,000
3,750
Petitioner retained exclusive possession of these bonds. A part of the deficiency in each of the years 1943 to 1948, inclusive, was due to fraud with intent to evade tax. The return for 1943 was false and fraudulent with intent *128 to evade tax. The first column in the table below shows the amount of net income reported by petitioner in his return for each of the years 1943 through 1948, the second column shows his net income as determined by the Commissioner, and the third column shows petitioner's correct net income for each of such years, each of which amounts in column three we here find and determine as an ultimate fact. Amount
Amount
Correct
Year
Reported
Determined
Net Income
1943
$10,130.32
$20,216.53
$18,000
1944
10,202.47
16,266.76
13,750
1945
10,747.16
41,142.53
27,500
1946
16,569.31
43,361.10
30,000
1947
16,795.98
38,043.62
27,000
1948
15,887.27
20,300.75
17,000
Opinion The issues here are purely factual, which have been largely resolved in our ultimate findings of fact, and we deem unecessary a detailed discussion of the evidence. The record is volunminous and it would serve no useful purpose to analyze it and set forth the reasons for our findings. The transcript of the hearings contained nearly a thousand pages of oral testimony, plus 93 written exhibits and one deposition, all of which we have carefully reviewed and considered. There *129 is no merit in petitioner's claim that his books and records correctly reflected his income for the taxable years. It is apparent from the record as a whole that they did not do so. Neither can we agree with petitioner's contention that the Commissioner was not warranted in using the net worth method in determining his income. As we stated in Estate of George L. Cury, 23 T.C. 305: "The net worth method is merely a method of marshaling evidence to show that the amount of income actually realized was in fact greater than disclosed by the entries made in the taxpayer's books. Nothing in section 41 precludes the use of such evidence, provided that it is otherwise competent. And where the employment of the net worth method reveals a substantial gap between reported income and the increase in net worth, the latter may be taken as a guide for determining the amount of income actually received. Such is the plain import of the Bartlett and Lipsitz cases. Cf. Michael Potson, 22 T.C. 912, 927; H. A. Hurley, 22 T.C. 1256, 1261. [Cf. David J. Pleason, 22 T.C. 361.]" As an offset to respondent's net worth analysis (Exhibit A), petitioner *130 offered in evidence a counter net worth analysis (Exhibit 25), compiled by a certified public accountant employed by petitioner for that purpose. These two documents differ widely in their contents. The figures and the conclusions reached therein are irreconcilable. One common attribute possessed is that the makers of each, in compiling same, apparently resolved all doubts in favor of their respective employers. This evidently is true of petitioner's net worth analysis, wherein petitioner's income, "as corrected", was fixed at $5,962 for 1947 and $3,218 for 1948, whereas petitioner, in his income tax returns, reported his income for those years at $16,795 and $15,887, respectively. Neither do we think respondent's net worth statement is realistic or in accord with the facts, and we are therefore unable to approve either statement as being correct. It is understandable why the parties in their net worth statements differed as to the facts. There was no common ground upon which to base same; there was no stipulation of facts, no books or records of any consequence, only fragmentary memoranda, cancelled checks, etc., and necessarily many of the facts and deductions therefrom were dependent *131 upon the oral testimony of petitioner, about which the parties differed widely. Furthermore, during the taxable years petitioner kept large sums of cash on his person, in his safe deposit box and in his office safe. What these amounts of cash were during any of the years, and also the source and disposition of same was in dispute. Under the state of the record here it is impossible to compute with mathematical accuracy a net worth statement. The same difficulty exists in determining petitioners' net income for each of the years in question. The evidence as a whole convinces us that petitioners' net income for each of the years was understated. The correct amount of petitioners' net income for each taxable year can only be approximated. We can not make either the finding requested by the Commissioner or by the petitioners as to the petitioners' income in the taxable years. Neither would be in accord with our appraisal of the facts. In the circumstances we have used our best judgment, based on a study of all the evidence and the record as a whole, and in our ultimate finding we have set forth our determination of the net income for each of the years in question, which is the best *132 approximation we can make on this record. Cf. Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540, 544; cf. Michael Potson, 22 T.C. 912, 929, affd. (C.A. 7) 230 Fed. (2d) 336. Except for petitioner's accountant who prepared his net worth statement and testified with reference thereto, all of petitioner's oral evidence was supplied by petitioner only. Petitioner's interest in the outcome necessarily makes his testimony subject to the closest scrutiny, and he was not a convincing witness. He sought to explain that in each of the taxable years no part of his excess bank deposits over his reported gross income was income received within that year. This we think he has failed to do. He testified that a portion of such excess deposits came from three different sources: (1) From various deposits of cash taken from his safe deposit box, received by him in prior years; (2) from his cashing of checks for his patients and others, and (3) cash given him by members of his family with which to purchase bonds for them, and also proceeds from sales of stock belonging to members of his family. We can not accept at face value these explanations, most of which *133 are based on petitioner's uncorroborated testimony. As to (1), petitioner in the taxable years did keep a large amount of cash on hand in his safe deposit box, his office safe and on his person, a practice frequently employed by tax evaders, but there was no record kept of such cash, the time it was received or the source from which it came. If bank deposits were made from such accumulated cash, the evidence is not clear or indisputable as to what year such cash was acquired or its source, and we have used our best judgment in determining same, as well as in all other controverted issues of fact. As to (2) there was no record kept and no evidence given as to all checks cashed by petitioner, either in amount or the year in which such checks were cashed, or where the cash used therfor was acquired. As to (3), in the absence of corroboration, we can not accept petitioner's testimony that a substantial part of the funds handled by him in the taxable years belonged to members of his family. His relatives to whom he attributed such ownership were his two sisters, his son, a newphew and his brother. Of these only his brother testified, and he by deposition. His brother's testimony related *134 to transactions he had with petitioner, but did not cover all financial transactions claimed to have been had with the other four relatives. No reason was given by petitioner as to why he did not call them as witnesses. Since there was no written or documentary evidence as to any of these claimed transactions, and in practically all instances no checks were given, but only cash was used, it would seem that petitioner, upon whom rested the burden of proof, should have procured the testimony of these relatives to corroborate his testimony as to such claimed transactions. Considering the close relationship of petitioner to the relatives in question, their apparent availability as witnesses, their apparent knowledge of the truth or falsity of petitioner's claimed transactions had with them, we think petitioner's failure to call them as witnesses gives rise to the inference that if these relatives had testified, their testimony would have been unfavorable to petitioner. Stoumen v. Commissioner (C.A. 3) 208 Fed. (2d) 903, 907, affirming Memorandum Opinion of the Tax Court [12 TCM 267]; Wichita Terminal & Elevator Co., 6 T.C. 1158, 1165, affd. (C. *135 A. 10) 162 Fed. (2d) 513. Petitioner bought a number of Government E bonds in the taxable years and claimed that his sisters had contributed the purchase money therefor. The bonds were issued in his name "or" their names so that either he or they could have cashed them, depending alone upon posession. He held possession of the bonds at all times. It would have been revealing to have had the sisters testify why they had petitioner, rather than their husbands, buy the bonds, and where they secured the money with which to buy same, since they were borrowing money from petitioner during that time; and furthermore, why, if the bonds belonged to them, petitioner was permitted to retain exclusive possession of them. These and other matters require clarification and verification by the sisters and the other relatives in question. Fraud Issue: Respondent determined that a portion of the deficiencies for each of the taxable years was due to fraud with intent to evade tax. On this issue the burden of proof is on respondent. Considering the evidence and the record as a whole, we think respondent has sustained his burden of proof in establishing fraud. Petitioner was a doctor *136 of medicine, an intelligent person, and personally looked after his business affairs. He had no bookkeeper. All bank deposits were made by him or under his supervision, he signed all checks and personally prepared all of his income tax returns, with such assistance as he got from the local Internal Revenue Service. Three cogent reasons here evidencing fraud are these: (1) A substantial understatement of his income in his returns for each of the six taxable years involved. Under the evidence it is inconceivable that petitioner did not know that his income was larger in each of the years than that reported. His persistent and continuous understatement of such income is significant. (2) His uniform practice of keeping large sums of cash in his safe deposit box, in his office safe and on his person, rather than depositing same in the bank or elsewhere. This practice prevented a record being kept of amounts of money received by him, or the year in which it was received, and thereby enabled him to conceal his income, which we think was the primary reason therefor. (3) His attempt to falsely attribute to members of his family ownership of money handled by him in the taxable years. *137 As to E bonds registered in his name or the names of his sisters, we think under the evidence a fair inference is that they were purchased with a view to tax evasion. So long as petitioner held possession of them, which he always did, the sisters could not cash them, and if a tax deficiency should be asserted against him, he could claim, as he did, that the sisters furnished the purchase money for the bonds. The third issue relates to petitioner's contention that the year 1943 is barred by limitation. Our holding that petitioner was guilty of fraud as to his tax return for that year requires us under section 276(a), I.R.C. of 1939, to sustain respondent on this issue. Decisions will be entered under Rule 50. Footnotes
1. From this sale he realized a gain of $2,374.70. ↩
2. Total gain from this sale was $98.58.↩